WILLIAM F. SMITH, Respondent, *v.* JOHN T. IJAMS and Others, as Executor and Executrices, etc., of PHŒBE SMITH, Deceased, Appellants.

70  155
141a 552

*Sale of a business by a son to his mother, since deceased — liability of her executors — forgiveness and cancellation of an indebtedness of the son to the mother — notes payable " one day after demand " — counterclaim and equitable set-off.*

In an action brought by a son against the executors of his deceased mother, to recover the price of a business alleged to have been sold to the decedent, the defendants' answer denied the sale, but admitting that the business had been transferred to the decedent, claimed that the transfer was to the decedent as a creditor and not as a purchaser, by reason of an indebtedness then existing from the plaintiff to the decedent on account of advances which she had made to him for the purposes of the business ; the answer then set up by way of counterclaim promissory notes given by the plaintiff for these advances, and asked judgment for the total amount thereof.

The plaintiff replied, reaffirming his allegation of a sale and pleading the Statute of Limitations against the notes, and claiming that the decedent had canceled his indebtedness to her and discharged him from all liability thereunder, including the notes in suit, by her will, which contained the following provision : " To my son, William F Smith (the plaintiff) I have given him during my lifetime all I ever intended to give him, so by the conditions of this will he inherits no further portion than that which he has already enjoyed."

The plaintiff was permitted to testify to the transaction with the decedent, and testified that she agreed to pay for the business whatever was realized after the accounts were collected and the obligations owing to different merchants paid, but that her account representing the indebtedness in question was to be excluded from consideration, and was so excluded. There was no direct evidence that the indebtedness was forgiven, and in fact the notes were not given up or physically canceled, and it appeared that six months before the sale the decedent agreed verbally not to sue her son upon these notes for ten years ; the defendants, under these circumstances, contended that the plaintiff's indebtedness remained in full force.

The plaintiff recovered a verdict for the amount realized by the decedent upon the alleged sale.

*Held*, that the plaintiff had established the sale averred in his complaint ;

That, in view of the fact that no other money had been given by the decedent during her life to the plaintiff than the advances represented by the notes, and of the other circumstances of the case, the indebtedness represented by the notes sought to be counterclaimed or set off must be regarded as having been forgiven by the decedent and the notes canceled ;

And hence that the judgment upon the verdict for the plaintiff should be affirmed.

Certain of the notes in question were payable "one day after demand," but no demand was pleaded or proved; the defendants claimed that a demand was unnecessary for the purposes of an equitable set-off, in view of the plaintiff's insolvency;

*Held*, (by BARRETT, J.), that even if the notes sought to be counterclaimed or set-off were not canceled, they were either outlawed or unmatured, and a legal counterclaim could not be maintained upon them;

And that an equitable set-off had not been pleaded nor, upon the facts, had a case of equitable set-off been made out.

APPEAL by the defendants, John T. Ijams and others, the executor and executrices of Phœbe Smith, deceased, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the city and county of New York on the 22d day of December, 1892, upon a verdict rendered at the New York Circuit, and from an order denying the defendants' motion for a new trial.

*Francis Lynde Stetson*, for the appellants.

*A. Britton Havens*, for the respondent.

BARRETT, J. :

This action was brought against the executor and executrices of Phœbe Smith, deceased, to recover the price of a certain business, which the plaintiff alleges that he sold to the decedent (who was his mother), in the month of December, 1884. The defendants, in their answer, deny the sale, but admit that the business was turned over to the decedent. Prior to the transfer, the decedent had advanced large sums of money to the plaintiff (and his partners) for the purposes of the business, and at the time of the transfer he was indebted to her in the amount of these advances. And the defendants claim that the transfer was to the decedent as a creditor, but not as a purchaser. The answer then sets up by way of counterclaim the promissory notes given by the plaintiff and by his firm for these advances, and asks judgment for the total amount thereof. The plaintiff replies to the counterclaim reaffirming his allegation of a sale and pleading the Statute of Limitations as against the notes. He also claims in his reply that, by her will, the decedent canceled his indebtedness to her and discharged him from all liability thereupon, including these notes. And in support of this claim he sets forth the following provision of the will:

" *Sixth.* To my son, William F. Smith, I have given him during my lifetime all I ever intended to give him, so by the conditions of this will he inherits no further portion than that which he has already enjoyed."

Upon the trial, the defendants permitted the plaintiff to testify without objection to the transaction with his mother.

He accordingly narrated all the facts which he recalled with regard to the agreement. His testimony abundantly supported the averments of the complaint upon that head and he was corroborated in several particulars by other witnesses. There was clearly enough to go to the jury and to support their verdict on the issue with regard to the sale.

The real question is, whether such agreement included the forgiveness and cancellation of the plaintiff's indebtedness upon the notes set up in the counterclaim. The amount of this indebtedness was nearly $100,000. The plaintiff testified that his mother agreed to pay for the business whatever was realized after the accounts were collected and the obligations owing to different merchants paid, but that her account representing the indebtedness in question was to be excluded from consideration. The net amount ultimately realized from the business was $28,956.23, while the actual amount realized by Mrs. Smith was but about $22,000. For it seems, that after taking the business and receiving therefrom less than $2,000 in cash, she in a short time turned it over to another son. But the consideration given by this other son was his own note for $20,000, which has never been paid. The verdict was for $22,000 and interest, so that the jury treated this latter sum as what Mrs. Smith " realized " within the meaning of the agreement.

The defendants' contention is that the plaintiff's existing indebtedness remained in full force notwithstanding the sale and that it still exists, subject only to a credit for $22,000 so realized.

On the other hand, the plaintiff contends that, in excluding the existing indebtedness from consideration at the time of the sale, the intention was to wipe it out as an obligation.

These varying contentions present an interesting question, but, upon the whole, we think the circumstances were such as to justify its presentation to the jury. The defendants rely upon the consideration that there is no direct evidence that the indebtedness was

forgiven; that, as matter of fact, the notes were not given up or physically canceled; and that some six months prior to the sale, Mrs. Smith agreed verbally not to sue her son upon these same notes for ten years.

But, while there was no direct evidence of cancellation, there were strong circumstances from which forgiveness of the indebtedness might properly be inferred. In the first place, the relations between the parties were not those of ordinary debtor and creditor. Mrs. Smith was the plaintiff's mother. She had derived from her husband a fortune which was largely accumulated in the conduct of this very business. After the death of the husband, the business was continued by the plaintiff, his brother Clarence and the decedent's son-in-law, Loeser. But the capital, which, in the father's lifetime, was between $300,000 and $400,000, was now reduced to $75,000. Mrs. Smith assisted the new firm from time to time, with advances, which finally amounted, as we have seen, to nearly $100,000. But, seemingly, the business did not prosper. First Loeser retired, then Clarence. And in December, 1884, the plaintiff found himself alone with a business worth less than $29,000. It is evident that Mrs. Smith's advances had meanwhile been sunk, and that her efforts to assist her sons to follow in their father's footsteps had failed. She had nothing to show for her loans except unsecured acknowledgments of indebtedness in the shape of notes. These notes she never used in any manner, nor did she demand payment thereof at any time during the eight years they were in her possession. In fact, she never acted in anywise as a creditor with regard to these obligations. She seems rather to have looked upon them as representative of advancements made to her sons of their share of her estate. If she did not look upon them in this light, the provisions of the will are worse than meaningless and her agreement to pay for the business seems quite unaccountable. Why, indeed, should she exclude her account from the consideration to be given for the business, unless she treated her son's indebtedness merely as a mother's advancement to be charged against him in the ultimate disposition of her property? Why should she pay him presently whatever might be realized from the business, if this indebtedness was vital? Why not simply credit upon the larger indebtedness to her the amount to be so realized? It is no answer to this to say that

she realized little or nothing because Clarence did not pay his $20,000 note. The question is, why did *she agree to pay* whatever might be so realized? And why, when the plaintiff, from time to time, demanded this agreed consideration did she put him off upon the plea that Clarence had not paid her? The evidence on this head is clear and conclusive.

The bookkeeper, Powell, testified that before the sale Mrs. Smith told him that she was going to purchase the plaintiff's interest, and requested him to go over the books and make an estimate of the value of the business including her account. Clarence testified that on one occasion his mother told him that she was going to pay the plaintiff what the business was worth. Another son, Isaac, testified to a conversation with her in which her purchase of the business from the plaintiff came up. He wanted to borrow some money from her and she told him she could not lend him any money as she owed the plaintiff too much and it would take all she had to pay him.

But for another circumstance, it might be said that all this was consistent with an intention to keep the indebtedness alive, but not to press yet awhile for payment. That other circumstance, however, points conclusively to a gift and to the consequent exclusion of the indebtedness from consideration, at a time and under circumstances when, if deemed existent, it would naturally have been adverted to and utilized. We refer to the provision of Mrs. Smith's will, already quoted. It should be observed that a precisely similar provision is made with regard to Clarence, and that substantially the whole estate, amounting to over $200,000, is given to the two daughters.

The evidence shows that Mrs. Smith had never given anything to the plaintiff except the advances in question. Nor to Clarence, unless the business itself, which was turned over to him for his $20,000 note, be considered an additional gift. This provision then written, we are told, by her own hand, was either a declaration that she had given the plaintiff these advances or it was a piece of solemn mockery. Surely this mother was not, at so serious a moment, guilty of flippant indecency. She never could have meant to say that she had given her son during her lifetime all she ever intended to give him, to wit, nothing; that that nothing was his "portion;" and "so he inherits no further portion than the nothing he has already enjoyed."

No. The reasonable construction of her words, the only construction consistent with respect, is this: I have given to my son, during my lifetime, all I ever intended to give him, to wit, the advances evidenced by these notes. That gift is his " portion." That he has already enjoyed, and "so " he inherits no "further portion."

Thus, after death, she speaks as a mother to a son with regard to his share of her estate, and not as a creditor to a debtor with regard to a debt due to her.

We think the learned judge at Circuit could not, upon these facts, have properly taken the case away from the jury and directed a verdict for the defendants. The question was fairly and clearly put to the jury, and the verdict is, in our judgment, conclusive.

But even if these notes were not forgiven or canceled, we do not think the defendants have established their counterclaim thereon. It may be true that the plea of the Statute of Limitations cannot avail as against the notes that were payable " one day after demand." The statute runs immediately against notes payable on demand. In that case, the word demand is not treated as part of the contract, but is used to show that the debt is due. (*McMullen* v. *Rafferty*, 89 N. Y. 459.) But, if payable at any period of time after demand, the weight of authority would seem to favor the doctrine that an actual demand must be made to fix the period of maturity when the statute commences. (*Wenman* v. *Mohawk Insurance Co.*, 13 Wend. 267; *Little* v. *Blunt*, 9 Pick. 488; *Codman* v. *Rogers*, 10 id. 112; *Richman* v. *Richman*, 5 Halst. [N. J.] 114; Daniels on Neg. Inst. § 1215; and see *Brehm* v. *The Mayor*, 104 N. Y. 192.) The basis of the latter rule is given by NELSON, J., in *Wenman* v. *The Mohawk Insurance Co.* (*supra*). "It is obvious," said that learned judge, " from the terms of the contract, an actual demand was contemplated by the parties before the note should become due." It may be questioned whether the present case comes within the reason of this rule. Did the parties here contemplate an actual demand before these notes should become due ? Some of them are payable " on demand," others " one day after date," still others " one day after demand." These phrases seem to have been used indiscriminately and without any special meaning or technical purpose. There was clearly no intention to put the notes in circulation or to give them any commercial status. They were simply acknowl-

edgments of advances and evidences of indebtedness therefor. There was no greater reason for an actual demand in the one case than in the other. If the notes in question had been made payable in six months or one year after demand, there would have been a suggestion at least of intended variation. But one day after demand probably meant no more to the plaintiff's mother, under the circumstances disclosed, than one day after date; or, for that matter, than an "I. O. U."

This rule, too, may cause great inconvenience if extended so as to permit the creditor, in all cases where the note is made payable shortly after demand, to choose his own time for its maturity and thus to prevent the debtor from paying his debt for an indefinite period. Unless delay is contemplated by the express terms of the contract, it would seem that a demand should at least be required within a reasonable time, and that the statute should commence to run at the expiration of the prescribed period thereafter. (See *Palmer* v. *Palmer*, 36 Mich. 487, 494; *Morrison* v. *Mullin*, 34 Penn. St. 12; *Lower* v. *Miller*, 66 Iowa, 408; *First Nat. Bank of Garrettsville* v. *Greene*, 64 id. 445; *Rhines* v. *Evans*, 66 Penn. St. 195.)

What, however, may safely be asserted in the present case is that if the statute did not run as to those notes payable one day after demand, it was because an actual demand was contemplated before they should become due. Now, such demand was neither pleaded nor proved. It is clear, therefore, either that these notes were outlawed or that they have not matured. In either case they cannot be sustained as counterclaims against the plaintiff's demand.

The defendants meet this view of the case by the contention that a demand was unnecessary for the purposes of an equitable set-off in view of the plaintiff's insolvency.

There are several answers to this position. In the first place, an equitable set-off is not pleaded. The answer sets forth simply a common-law counterclaim, and demands judgment affirmatively for the full amount of the notes. It was not until the plaintiff was about to rest upon the trial that the defendants stated that they asked no affirmative judgment, but merely claimed an offset. Even then, no attempt was made to amend the answer in this particular.

And it was not until the case was closed, their motion for a direction denied, and the learned judge was about to charge the jury, that they asked to amend their answer so as to set up the plaintiff's inability to pay the notes.

This amendment was asked " to conform the answer to the proof in a single particular," and there the case rested. It is quite evident that this legal counterclaim was not thus turned into the equivalent of a complaint by the defendants against the plaintiff for an equitable set-off.

But if there had been a proper pleading and trial in equity no case was made out for an equitable set-off. The insolvency of the plaintiff did not change the character of his obligation nor could it vary the items of his contract. Whether solvent or insolvent, his agreement was to pay one day after demand. The right of a solvent creditor to set off his own unmatured obligation in the hands of his insolvent debtor, against the latter's matured obligation in his, the creditor's, hands, rests upon such creditor's privilege to waive the period of credit given him by his contract. (*Hughitt* v. *Hayes*, 136 N. Y. 163.) But it is one thing for him to waive his own right and another to abridge his debtor's right. This latter power has, doubtless, been asserted by courts of equity in some cases, but the question is not absolutely settled in the court of last resort. It must be conceded that in that court the right of the solvent creditor to set off his insolvent debtor's unmatured debt against his, the creditor's, matured obligation is, at least, questionable. (*Richards* v. *La Tourette*, 119 N. Y. 59.) As was said by PECKHAM, J., in the latter case : " Whether it be equitable or not, the power of a court might well be doubted to absolutely change a contract entered into by the parties, without the consent of the one who was to make the payment at the time in the manner prescribed by the contract." (See, also, *Bradley* v. *Angel*, 3 N. Y. 475.)

This doubt, however, is solved in the present case by the defendants' own attitude. Their whole case rests upon the contention that these notes have not matured. It is by holding the plaintiff strictly to that view of his obligation, that they seek to avoid the running of the statute. How, then, can they assert for one purpose, that the demand was necessary, and for another, that it was not ? To save themselves from the effect of the statute, they say that the notes had

not matured. That is a claim of strict law. Then, to effect the set-off, they say that the notes had matured. That is, that they are to be treated as though they had. That is a claim of equity. In one case, they insist upon the period of maturity. In the other, they insist upon abridging it. This latter, it is quite clear, cannot, under the circumstances, be done. The contract to which they have held the plaintiff for one purpose, should not, without his consent, be changed for another purpose.

But this is not the only difficulty with the defendants' case. Their sole equity is the plaintiff's inability to pay these notes. That inability is what they pleaded and proved. There was no other or general insolvency. But this inability to pay these particular notes has existed throughout. Mrs. Smith knew it when she agreed to pay for the business. A bill for an equitable set-off on this ground, could, therefore, have been filed at any time after the consideration for the business had become due and payable. But no such set-off was sought during all these years. And then, too, there was at all times a perfect remedy at law, for Mrs. Smith had only to make a demand to effect the maturity of the notes. They would then have been the subject of a legal offset or counterclaim. Her representatives cannot now found an equity upon her *laches*.

The power of equitable set-off " should," as was said in *Armstrong* v. *McKelvey* (104 N. Y. 185), " be very cautiously exerted, and only in a case where the equity invoked is entirely clear and certain. It is never justified save where other remedies are impossible, and where the demand allowed is put beyond reasonable doubt."

Upon these principles, we think the set-off was clearly inadmissible, and that the plaintiff was entitled to recover the agreed price of the business, without deduction.

Our conclusions upon the whole case are : *First.* That the plaintiff has established the sale averred in his complaint. *Second.* That the indebtedness represented by the notes sought to be counter-claimed or set off was, as a matter of fact, forgiven by the decedent and the notes canceled. *Third.* That even if these notes were not canceled, they are either outlawed or unmatured, and a legal counterclaim cannot be maintained upon them. *Fourth.* That an equitable set-off upon these notes has not been pleaded, nor upon the facts has a cause of equitable set-off been made out.

There was no error in the admission or rejection of evidence which could have prejudiced the defendants, and the judgment should, therefore, be affirmed.

VAN BRUNT, P. J., concurred on first and second grounds mentioned in opinion.

FOLLETT, J., concurred in result.

Judgment affirmed.